# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| RONALD J. BARGANTINE, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No: |
| MECHANICS COOPERATIVE BANK, | ) ) ) | |
| Defendant | ) ) | **VERIFIED COMPLAINT** |

## PARTIES

1. Ronald Bargantine is a resident of Barrington, Rhode Island.

2. Mechanics Cooperative Bank is located in Taunton, Massachusetts.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000.00.

4. This Court has personal jurisdiction over the Defendant because Defendant is chartered and has its principle place of business within the Commonwealth.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (a) because the Defendant is subject to personal jurisdiction within this district.

## FACTS

*Background*

6. Plaintiff, Mr. Bargantine, owns and manages Realtime One, LLC ("Realtime One"), a Rhode Island limited liability company formed in January 2006. Realtime One provides businesses with telephone networking equipment and related services.

7. Several years before forming Realtime One, Mr. Bargantine was employed by Black Box Network Services (Black Box"), a company also in the business of providing telephone networking equipment and related services.

8. As a Black Box employee, Mr. Bargantine performed services for J&J Marine Fabricating ("J&J Marine or "Marina"), a company that operated a marina in Somerset, Massachusetts. Mr. Bargantine formed a relationship with J&J Marine principal Steven Anderson and in time Mr. Bargantine became one of the marina's most trusted vendors.

9. Mr. Bargantine later left Black Box and after some time began servicing the Marina's telephone system again, as owner of Realtime One.

10. As of the summer of 2011, J&J Marine owed Realtime One approximately $9,000 in outstanding balances for sale of additional telephones and related services.

11. On or about August 9, 2011, Mr. Bargantine learned that Defendant Mechanics Cooperative Bank ("Mechanics" or "Bank") had taken control of the Marina. Thereafter he contacted Bank Senior Vice President Nancy Stokes regarding the debt's repayment.

***Events Leading to the Removal of the Telephone System and Subsequent Police Involvement***

12. On or around August 10, 2011, Mr. Bargantine spoke with Ms. Stokes, explaining that he was owed several thousand dollars by the Marina for sales of some of the equipment and services. During their brief conversation Ms. Stokes proposed that Mr. Bargantine could remove all of the telephones as partial restitution for Marine's debt since the Marina had closed and the system was presumably no longer of any use. Ms. Stokes said that she would arrange his entry upon the premises to retrieve the system.

13. The telephone system in question was old and faulty; it had to be unplugged and reset every few months. Although it retained only a fraction of its original value -- determined

by an expert to be around $900 -- Mr. Bargantine nevertheless agreed to take the equipment as partial payment on the Marina's debt to Realtime One.

14. Despite the Bank's repossession of the Marina due to J&J Marine's insolvency, Ms. Stokes never asked Mr. Bargantine for any documentation as to his identity, what Realtime One was owed, or whether he had any proof of his or Realtime One's status with regard to the equipment.

15. Pursuant to Ms. Stokes' instructions, Mr. Bargantine went to the Marina, was admitted by someone taking direction from the Bank, and removed the telephone system.

16. At some point a few days later, Mr. Anderson advised Ms. Stokes that ongoing operations had been interrupted by the telephone system's removal from the premises.

17. Ms. Stokes then contacted Mr. Bargantine and attempted to renege on her agreement to give him the system, accusing him of misleading her to obtain the system.

18. Thereafter, Ms. Stokes contacted the Somerset Police Department and contended that Mr. Bargantine had fraudulently or otherwise stolen the equipment.

19. The Bank never filed a demand letter pursuant to M.G.L. c. 93A, filed civil suit, nor made any civil demand to Realtime One or Mr. Bargantine. Further, Ms. Stokes later admitted that she had "mistakenly assumed" that the equipment was leased.

20. In or around mid-September 2011, the police contacted Mr. Bargantine, stating that they were seeking proof that J&J Marine owed him money. Mr. Bargantine complied, furnishing the police with receipts showing sales and service of the equipment to the Marina. At the conclusion of such contact Mr. Bargantine did not hear again from the police and assumed that they were satisfied by his documentation.

*Mr. Bargantine's Agreement with the Bank*

21. In 2010, Mr. Bargantine and his former wife divorced. Nevertheless, they have maintained amicable relations and in late September/early October 2011 at Mr. Bargantine's request, she contacted the Bank on his behalf to attempt to resolve the situation. In response the Bank indicated that if Mr. Bargantine returned the phones that it would take no further action against him.

22. While he agreed to return the phones, the Bank further required Mr. Bargantine to reinstall the system, which would have been difficult as it would take ten to twelve hours of labor to reprogram them.

23. Nevertheless upon learning from Mr. Anderson in November that the Marina had located a potential buyer, Mr. Bargantine agreed to reinstall the phone system. In return, the Bank agreed to call the Somerset Police Department and inform them that Mr. Bargantine had returned the telephone system to its prior condition and that the Bank was satisfied.

24. On or around December 12, 2012, Ms. Stokes emailed Mr. Anderson asking him to let her know when the phone system's reinstallation was complete so that she "can do something about the pending charges against him."

25. On or around December 16, 2011, Mr. Anderson emailed Ms. Stokes that reinstallation of the system was 92% complete, equipment was operating, and that Mr. Bargantine would finish reinstalling six phones on the following Monday. The Bank later acknowledged that it had been notified in late December 2011 that Mr. Bargantine had completed reinstallation of the system.

4

### Mr. Bargantine's arrest and incarceration.

26. Unbeknownst to Mr. Bargantine, after receiving the Bank's complaint and information from Mr. Bargantine, in or around October 2011 the police charged him with larceny over $250, directing him to appear before the Fall River District Court on December 21, 2011.

27. Mr. Bargantine never received notice as it was served on his old marital address, which he had vacated some two years earlier prior to his divorce[1].

28. The summons was received by Mr. Bargantine's then 14-year-old son, who placed it in a pile of college applications for his older sister. Unaware of the charges against him, Mr. Bargantine did not appear at the scheduled criminal hearing and a default warrant issued.

29. On January 8, 2012, Mr. Bargantine was pulled over for a routine traffic violation in Rhode Island. The police discovered the warrant, placed him in handcuffs, arrested him, took mug shots and fingerprinted him. For the next three days he was incarcerated in the Adult Correctional Institution in Cranston Rhode Island, a facility that houses violent offenders.

30. Having no prior criminal record, Mr. Bargantine was terrified the entire time and slept very little. His legs were shackled, he was again fingerprinted and had more mug shots taken. Moreover, he underwent three full body cavity searches, shared a cell with a hardened criminal, had to watch a video on how to avoid prison rape, observed a man being brutally beaten and bloodied by another inmate, and was subjected to a "gang-shower" in full view of criminals.

---

[1] He left the marital home in Rehoboth in 2009, and officially changed his address at that time; his name was removed from the deed in 2010. His business address at Realtime One has been the same since 2007.

31. Eventually Mr. Bargantine was returned to Massachusetts and months later the charges were dismissed.

32. Upon learning of Mr. Bargantine's incarceration from Mr. Anderson on January 10, 2012, Ms. Stokes stated, among other things, "Oh sh--, I forgot to call the police," or something to that effect. Ms. Stokes also filed a document with the court admitting in relevant part: "In late December, I was notified by the new owners of [the Marina] that Mr. Bargantine had…reinstalled the telephones. At this time, the Bank is satisfied that this matter has been resolved…[and that he had done] all I wanted him to do all along."

**Damages to Mr. Bargantine and Realtime One**

33. As a result of his arrest and three-day incarceration Mr. Bargantine suffered severe emotional distress, including symptoms of panic, stress, humiliation, and depression, for which he underwent therapy and was prescribed anti-depression medication.

34. Mr. Bargantine further expended approximately $4,500 in legal fees in defense of the criminal charges against him.

35. After his release Mr. Bargantine, who had only recently located to Barrington, Rhode Island, learned that his arrest and incarceration had been publicized in the media and on the Internet. His reputation, personally and as an officer of Realtime One, remains severely damaged.

36. Within two weeks of Mr. Bargantine's release, Realtime One's business manager resigned from the company, indicating her discomfort working with Mr. Bargantine as a result of the criminal charges against him.

37. That same day he had to terminate Realtime One's key salesperson, who had stopped returning his calls, on information and belief for the same reason.

38. Realtime One's revenues, which despite the weak economy had enjoyed robust growth in the three years prior to the events, fell by more than two thirds after Mr. Bargantine's arrest and have not recovered. Directly following the events described herein customer calls decreased by approximately 70%.

39. As a result of the company's diminished earnings, Mr. Bargantine had to lay off a third key employee and Realtime One and since has been unable to sustain employment of a business manager.

## COUNT I.

### *Breach of Contract*

40. Plaintiff re-alleges and reasserts the allegations of paragraphs 1 through 39 as if fully set forth herein.

41. Defendant and Plaintiff formed a contract that Plaintiff would return and reinstall the telephone system at the Marina, in consideration for which, Defendant agreed to call the Somerset Police Department to inform them that Plaintiff had returned the telephone system to its prior condition and that Defendant was satisfied.

42. Plaintiff fully performed his duties under the contract in December 2011, which Defendant has acknowledged it knew at the time.

43. Defendant breached its duties under the contract as it failed to contact the police to report that Plaintiff had reinstalled the telephone system at the Marina.

44. As a result of Defendant's breach, Plaintiff has suffered damages including but not limited to the following: (i) severe emotional distress, including symptoms of panic, stress, humiliation and depression, for which he underwent therapy and was prescribed anti-depression medication; (ii) lasting damage to his reputation incurred by the charges

and his arrest, as published in the media; and (iii) a decrease by more than 70% of Realtime One's customer calls and gross revenues, and loss of key employees after the events occasioned by Defendant's breach.

## COUNT II.

### *Negligence*

45. Plaintiff re-alleges and reasserts the allegations of paragraphs 1 through 44 as if fully set forth herein.

46. By agreeing to notify the police that Plaintiff had reinstalled the telephone system at the Marina, Defendant assumed a duty of care towards Plaintiff, including a duty to exercise reasonable care in promptly notifying the police as agreed.

47. Defendant breached such duty in failing to notify the police despite its actual knowledge that Plaintiff had reinstalled the system.

48. As a direct and proximate cause of Defendant's breach of duty, Plaintiff was arrested and incarcerated for three days and has suffered damages including but not limited to the following: (i) severe emotional distress, including symptoms of panic, stress, humiliation and depression, for which he underwent therapy and was prescribed anti-depression medication; (ii) lasting damage to his reputation incurred by the charges and his arrest, as published in the media; and (iii) a decrease by more than 70% of Realtime One's customer calls and gross revenues, and loss of key employees after the events occasioned by Defendant's breach.

49. It was reasonably foreseeable that as a result of Defendant's negligent failure to contact the police after Plaintiff had reinstalled the telephone system that the criminal prosecution would continue and that Plaintiff would suffer the damages as described above.

## COUNT III

### Negligent Misrepresentation

50. Plaintiff re-alleges and reasserts the allegations of paragraphs 1 through 49 as if fully set forth herein.

51. In the ordinary course of business Defendant represented that if Plaintiff reinstalled the telephone system at the Marina, Defendant would notify the police.

52. By reinstalling the telephone equipment and informing Defendant, Plaintiff justifiably relied on Defendant's representation that it would notify the police upon the reinstallation's completion.

53. Defendant failed to exercise reasonable care or competence in communicating the information on which Plaintiff relied as it failed to notify the police that Plaintiff had reinstalled the system despite its actual knowledge.

54. As a direct and proximate cause of Defendant's negligent misrepresentation, Plaintiff was arrested and incarcerated for three days and has suffered damages including but not limited to the following: (i) severe emotional distress, including symptoms of panic, stress, humiliation and depression, for which he underwent therapy and was prescribed anti-depression medication; (ii) lasting damage to his reputation incurred by the charges and his arrest, as published in the media; and (iii) a decrease by more than 70% of Realtime One's customer calls and gross revenues, and loss of key employees after the events occasioned by Defendant's breach.

## COUNT IV.

### *Negligent Infliction of Emotional Distress*

55. Plaintiff re-alleges and reasserts the allegations of paragraphs 1 through 54 as if fully set forth herein.

56. Defendant assumed a duty of care towards Plaintiff in agreeing to notify the police that Plaintiff had reinstalled the telephone system at the Marina. Defendant breached such duty in failing to notify the police despite its actual knowledge that Plaintiff had reinstalled the system.

57. As a direct and proximate result of Defendant's negligence, Plaintiff was arrested without notice or cause and incarcerated for three days in a prison facility housing violent offenders, underwent criminal proceedings, and saw his flourishing business quickly reduced to a fraction of its prior worth.

58. Plaintiff, who had no prior criminal record, reasonably suffered severe emotional distress during and after his arrest and incarceration, manifest by the objective symptoms of panic, stress, humiliation and depression, for which he underwent therapy and was prescribed anti-depression medication.

## COUNT V.

### *Malicious Prosecution*

59. Plaintiff re-alleges and reasserts the allegations of paragraphs 1 through 58 as if fully set forth herein.In contacting the Somerset Police Department and falsely contending that Mr. Bargantine had fraudulently or otherwise stolen the telephone equipment from the Marina, Defendant caused criminal proceedings to be initiated by inducing the police to lodge criminal charges against Plaintiff.

60. Defendant instituted criminal proceedings against Plaintiff with malice, as it had the improper motives of (i) exerting pressure on Plaintiff to cause Realtime One to reinstall

the phone system in the Marina that Defendant had previously given Realtime One permission to remove; and (ii) insulating itself from potential claims arising from its own acts of negligence in improperly allowing Realtime One to remove property from the Marina without proof of right or appropriate process.

61. Defendant instituted criminal proceedings against Plaintiff without probable cause as evidenced by, *inter alia*: (i) Defendant had given Realtime One permission to remove the telephone system from the Marina and Plaintiff did not misrepresent that company's ownership of such system; (ii) the criminal complaint on its face lacks probable cause; and (iii) these criminal charges were brought for improper motives, and were terminated in Plaintiff's favor by dismissal.

**COUNT VI.**

*Abuse of Process*

62. Plaintiff re-alleges and reasserts the allegations of paragraphs 1 through 61 as if fully set forth herein.

63. After realizing its mistake in allowing Realtime One to remove the telephone system from the Marina, Defendant used criminal process against Plaintiff by contacting the Somerset Police Department and falsely contending that he had fraudulently or otherwise stolen the equipment.

64. The Bank never filed civil suit or made any civil demand to Realtime One or Mr. Bargantine.

65. As a direct result of Defendant's complaint, the police brought criminal charges of larceny over $250 against Plaintiff, which were dismissed only after Realtime One had

reinstalled the telephone system and then Plaintiff had been arrested and incarcerated for three days.

66. Defendant caused such charges to be brought for the ulterior and illegitimate purposes of: (i) exerting pressure on Realtime One to reinstall the phone system in the Marina that Defendant had previously given it permission to remove; and (ii) insulating itself from potential claims arising from its own acts of negligence in improperly allowing Realtime One to remove property from the Marina without proof of right or appropriate process.

67. As a result of Defendant's abuse of process, Plaintiff has suffered damages including but not limited to the following: (i) severe emotional distress, including symptoms of panic, stress, humiliation and depression, for which he underwent therapy and was prescribed anti-depression medication; (ii) lasting damage to his reputation incurred by the charges and his arrest, as published in the media; and (iii) a decrease by more than 70% of Realtime One's customer calls and gross revenues, and loss of key employees after the events occasioned by Defendant's acts.

## COUNT VII

*Intentional Infliction of Emotional Distress*

68. Plaintiff re-alleges and reasserts the allegations of paragraphs 1 through 67 as if fully set forth herein.

69. By falsely reporting to the police that Plaintiff's removal of the phone was as a result of misrepresentation and theft, Defendant intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of its conduct.

70. Knowing that Plaintiff's arrest and incarceration might result from its conduct, such conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community.

71. Defendant's actions caused Plaintiff to suffer severe emotional distress of a nature that no reasonable man could be expected to endure, during and long after his arrest and incarceration, including the symptoms of panic, stress, humiliation and depression, for which he underwent therapy and was prescribed anti-depression medication.

## COUNT VIII

### *Violations of M.G.L. Chapter 93A*

72. Plaintiff re-alleges and reasserts the allegations of paragraphs 1 through 71 as if fully set forth herein.

73. The above acts, including but not limited to the Bank's negligence, breach of contract, malicious prosecution and abuse of process, were unfair and deceptive acts as defined by M.G.L. Chapter 93A.

74. Plaintiff served Demand Letters on Defendant Pursuant to G.L. 93A, on or around May 14, 2012 and October 18, 2012.

75. The conduct described above was directed at Plaintiff in Massachusetts, involved representations to and communications with Plaintiff in Massachusetts, and therefore occurred primarily and substantially in the Commonwealth.

76. As a result of Defendant's conduct, Plaintiff has suffered damages including but not limited to the following: (i) severe emotional distress, including symptoms of panic, stress, humiliation and depression, for which he underwent therapy and was prescribed anti-depression medication; (ii) lasting damage to his reputation incurred by the charges

and his arrest, as published in the media; and (iii) a decrease by more than 70% of Realtime One's customer calls and gross revenues, and loss of key employees after the events occasioned by Defendant's acts.

## REQUEST FOR RELIEF

**WHEREFORE** Plaintiff, Ronald J. Bargantine, hereby requests relief as follows:

i. Injunctive relief ordering Defendant to assist Plaintiff in causing his criminal record to be expunged;

ii. Damages in an amount to be determined at trial;

iii. Costs, attorneys' fees and treble damages pursuant to M.G.L. c. 93A; and

iv. Such other legal or equitable relief as the Court may award.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,
RONALD J. BARGANTINE,
By his counsel:

/s/ Beth M. Nussbaum
Emily E. Smith-Lee (BBO# 634223)
esmithlee@slnlaw.com
Beth M. Nussbaum (BBO# 633878)
bnussbaum@slnlaw.com
Smith Lee Nebenzahl, LLP
One Post Office Square
Sharon, MA  02067
781-784-2322
781-793-0600 (facsimile)

Dated: May 6, 2013

# VERIFICATION

I declare and affirm, under the pains and penalties of perjury, that to the best of my knowledge the allegations set forth above are true and accurate.

*[signature]*
Ronald Barganting
Dated: May 6, 2013